THIS OPINION IS
A PRECEDENT OF
THE TTAB

Mailed:  September 9, 2008

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

Boston Red Sox Baseball Club Limited Partnership
v.
Brad Francis Sherman

———

Opposition No. 91172268

———

Mary L. Kevlin and Thomas Kjellberg of Cowan, Liebowitz & Latman, P.C. for plaintiff.

Brad Francis Sherman, pro se.

———

Before Seeherman, Holtzman and Kuhlke, Administrative Trademark Judges.

Opinion by Holtzman, Administrative Trademark Judge:

Applicant, Brad Francis Sherman, has filed an application to register the mark shown below.



Applicant seeks registration of the mark for the following goods:

> Clothing, namely, shirts, T-shirts, under shirts, night shirts, rugby shirts, polo shirts, cardigans, jerseys, uniforms, athletic uniforms, pants, trousers, slacks, jeans, denim jeans, overalls,

coveralls, jumpers, jump suits, shorts, boxer shorts, tops, crop tops, tank tops, halter tops, sweat shirts, sweat shorts, sweat pants, wraps, warm-up suits, jogging suits, track suits, blouses, skirts, dresses, gowns, sweaters, vests, fleece vests, pullovers, snow suits, parkas, capes, anoraks, ponchos, jackets, reversible jackets, coats, blazers, suits, turtlenecks, cloth ski bibs, swimwear, beachwear, tennis wear, surf wear, ski wear, infantwear, baby bibs not of paper, caps, swim caps, berets, beanies, hats, visors, headbands, wrist bands, sweat bands, headwear, ear muffs, aprons, scarves, bandanas, belts, suspenders, neckwear, neckties, ties, neckerchiefs, ascots, underwear, briefs, swim and bathing trunks, bras, sports bras, brassieres, bustiers, corsets, panties, garters and garter belts, teddies, girdles, foundation garments, singlets, socks, loungewear, robes, bathrobes, underclothes, pajamas, sleepwear, night gowns, lingerie, camisoles, negligees, chemises, chemisettes, slips, sarongs, leg warmers, hosiery, pantyhose, body stockings, knee highs, leggings, tights, leotards, body suits, unitards, body shapers, gloves, mittens, footwear, shoes, sneakers, boots, galoshes, sandals, zori, slippers, rainwear, baseball caps, wool hats, knit hats, in Class 25.

The application was filed on July 19, 2005 based on an allegation of a bona fide intention to use the mark in commerce.[1]

Opposer, Boston Red Sox Baseball Club Limited Partnership, filed a notice of opposition on August 2, 2006. Opposer alleges that since long prior to applicant's constructive first use date, opposer has used various marks that consist of or incorporate the words RED SOX ("RED SOX Marks"), including a mark in the particular stylized font shown below, in connection with baseball game and exhibition services and a wide variety of goods including clothing, paper goods and printed matter, toys and

---

[1] Application Serial No. 78673909.

sporting goods.

# RED SOX

Opposer has pleaded ownership of 16 registrations for marks consisting of or comprising the term RED SOX or a "RED SOX" image for a variety of goods and services. Opposer alleges that as a result of extensive sales and promotion opposer has built up highly valuable goodwill in the marks. Opposer further alleges that applicant's mark, displayed in the particular stylized font, is intended and will be understood to refer to the "Boston Red Sox Major League Baseball" club.

As its original grounds for opposition, opposer alleged priority and likelihood of confusion under Section 2(d) of the Trademark Act; and three grounds under Section 2(a) of the Act: (1) that the mark consists of immoral and scandalous matter; (2) that the mark disparages opposer and/or brings it into contempt or disrepute; and (3) that the mark falsely suggests a connection with opposer. Opposer subsequently amended the opposition to additionally allege that applicant did not have a bona fide intention to use the mark at the time of filing the application.

Applicant filed an answer to the amended pleading admitting that opposer has used its "RED SOX Marks" as alleged by opposer; that the goods identified in the application are identical or closely related to the goods and services offered in connection with opposer's "RED SOX Marks"; that valuable goodwill is

3

associated with opposer's marks; and that applicant's mark "is intended to refer to the BOSTON RED SOX MAJOR LEAGUE BASEBALL club."[2]  In addition, applicant admits that he has not yet used his mark.  Applicant has denied the remaining salient allegations.

**THE RECORD**

The record includes the pleadings and the file of the involved application.  In addition, opposer has submitted a notice of reliance on status and title copies of its pleaded registrations,[3] including the following;



Registration No. 1568406 (issued November 28, 1989; renewed) for "ornamental novelty items, namely, pins, in Class 20; and beverage containers, namely, thermal mugs, thermal steins, tankards and drinking cups" in Class 21.

## RED SOX

Registration No. 1642769 (issued April 30, 1991; renewed) for "paper goods and printed matter, namely, bumper stickers, pens, pencils, posters, baseball cards, programs about baseball, magazines about baseball, books about baseball, calendars,

---

[2] We have construed applicant's answers that he "has no reason to deny" certain allegations as affirmative admissions of such allegations.

[3] The notice of reliance also includes status and title copies of several registrations which were not pleaded in the notice of opposition.  Because applicant has not objected to opposer's reliance on the unpleaded registrations, and moreover has, in effect, treated them as of record in his brief, we deem opposer's pleading amended to assert the registrations under Fed. R. Civ. P. 15(b).  We add, however, that whether or not these registrations are considered, the result in this case would be the same.

playing cards" in Class 16; and "clothing, namely, shirts, jackets, ponchos, caps, bibs, two-piece diaper sets; baby bootees; and short sets, sweatshirts" in Class 25.

Registration No. 1095475 (issued July 4, 1978; renewed) for "entertainment services in the nature of baseball exhibitions" in Class 41.



Registration No. 1736679 (issued December 1, 1992; renewed) for "clothing; namely, shirts to promote a professional baseball team; namely, the Boston Red Sox" in Class 25.



Registration No. 2692105 (issued March 4, 2003) for "entertainment services, namely, baseball games, competitions and exhibitions rendered live, through broadcast media including television and radio and via a global computer network or a commercial on-line service; providing and disseminating information in the field of sports, entertainment and related topics, and providing multi-user interactive computer games, all via a global computer network or a commercial on-line service; education services in the nature of baseball skills instruction" in Class 41.

Registration No. 1529324 (issued March 14, 1989) for, as restricted by its Section 8 affidavit, "metal novelty items, namely, key tags, key chains, trophies of non-precious metal, metal display boards and money clips" in Class 6; "watches, clocks, souvenir coins, and jewelry, namely, cloisonne pins, costume jewelry pins, 14 kt/silver [sic] charms and pendants, 14kt [sic] gold pins, hand-painted lapel pins" in Class 14; "paper goods and printed matter, namely, stickers and sticker albums, baseball trading cards, pens, paper tablecloths, wrapping paper, playing cards, bumper stickers and lithographs" in Class 16; "ornamental novelty items, namely, plaques, musical celluloid buttons, decorative wall and baseball stands" in Class 20; "small domestic utensils and containers, namely, mugs, pewter tankards,

drinking cups, glasses, insulating sleeves for beverage containers, mini mugs, all purpose portable containers, coasters not of paper or linen, shot glasses, ice cream containers, paper plates and wastebaskets" in Class 21; "fabrics, namely, towels, pennants, golf towels, bedspreads, sheets, bath mats, shower curtains, cotton wallhangings, stadium blankets and potholders" in Class 24; "clothing, namely, socks, children's playsets comprising shirts and shorts, boxer shorts, visors, poplin jackets, t-shirts, sweatshirts, athletic shorts, 3/4 sleeve jerseys, satin jackets, neckties, canvas belts with buckle, caps, wrist and head bands" in Class 25; "belt buckles and embroidered patches" in Class 26; "toys and sporting goods, namely, baseballs, flying disks, balloons, decorative windstocks [sic], Christmas tree ornaments, helmet shaped banks, putters, golf balls, autographed baseballs, inflatable bats, stuffed animals and batting gloves" in Class 28; and "smoker's articles, namely, ashtrays and lighters" in Class 34.



Registration No. 1232820 (issued March 29, 1983; renewed) for "baseball caps" in Class 25.

Registration No. 1060117 (issued February 22, 1977; second renewal) for "entertainment services in the nature of baseball exhibitions" in Class 41.

RED SOX

Registration No. 1596321 (issued May 15, 1990; renewed) for "paper products and printed matter, namely, baseball trading cards" in Class 16; "textile fabrics, namely, cloth pennants and towels" in Class 24; "clothing, namely, shirts" in Class 25; "embroidered patches" in Class 26; and "Christmas tree ornaments" in Class 28.

Opposer's notices of reliance also include copies of opposer's pending applications and file contents for various "RED SOX" marks; printouts of articles from the Lexis/Nexis database,

and various other printed publications; applicant's responses to certain interrogatories and admission requests; and dictionary definitions.

In addition, the record contains stipulated declaration testimony, with exhibits, by both parties. Opposer submitted the declarations of Ethan G. Orlinsky, senior vice president, general counsel and corporate secretary of Major League Baseball Properties, Inc. (MLBP), the licensing agent for opposer; and Polina Belomlinskaya, a paralegal with the law firm of opposer's counsel. Applicant submitted his own declaration, i.e., the declaration of Brad Francis Sherman. As rebuttal, opposer submitted an additional declaration of Mr. Orlinsky.

Both opposer and applicant filed briefs.

## FINDINGS OF FACT

Opposer is the owner of Boston Red Sox Major League Baseball (the "Club"), which was established in 1901. The Club adopted the nickname "RED SOX" in 1907 and has used the mark continuously since the 1908 season. The Club's home uniforms have displayed the mark RED SOX since 1912, and since 1936, the RED SOX mark has appeared on the Club's home uniforms in the form shown below:[4]



Since the 1930s, the Club has used the font of the RED SOX stylized mark in combination with the Club's current primary logo:



The font of the RED SOX stylized mark is also included in opposer's other marks such as its "B" logo which appears on the Club's uniform caps;



and the logo shown below which appears on the Club's away uniforms:



The Club's home games are held at Fenway Park in Boston. Over 124 million people have attended the games since the ballpark opened in 1912. The Club also regularly plays in many other major cities throughout the United States.

---

[4] Future references to this mark will be to the "RED SOX stylized mark."

The "RED SOX" team and marks have had extensive public exposure. The Club's games have been broadcast on the radio since 1926, and have been televised since 1948. Since 2001, 58 of the Club's regular season games have been broadcast nationally on the Fox Network; and 143 regular season games have aired on ESPN and ESPN2. Over 100 million viewers watched the Fox broadcasts of the World Series games between the Boston Red Sox and the St. Louis Cardinals in 2004. The Club's games are also regularly broadcast on various local networks in Boston's regional market such as New England Sports Network (NESN).

The team has been the subject of numerous print and Internet articles. Cover stories and articles about the Red Sox have appeared in widely distributed publications such as Sports Illustrated, USA Today and The New York Times, as well as on websites such as espn.com and the website of CNN-Sports Illustrated (sportsillustrated.cnn.com). The stories and articles are frequently accompanied by photographs of players wearing their home uniforms, with visible displays of the RED SOX stylized mark. The team received particularly intense media attention and coverage leading up to and following the 2004 World Series as the result of the long gap in championship titles from 1918 until 2004. The team's success was termed by Sports Illustrated as "the most improbable comeback in baseball history." (Id., ¶ 19.) In addition, the Club's 2004 championship season formed the backdrop for the movie *Fever*

9

*Pitch*, starring Drew Barrymore, which grossed over $42 million in its U.S. theatrical release.

The Club has also participated in promotions through print and television advertising of its various marks with corporate sponsors such as Bank of America, State Farm Insurance, K-Mart, Reebok, Sharp, XM Satellite Radio and Sports Authority. For example, Bank of America has offered credit cards depicting the RED SOX stylized mark; Reebok has featured the "BOSTON RED SOX" logo as well as the stylized "B" mark in its advertisement for Major League Baseball themed footwear; and XM Satellite Radio has featured images of the RED SOX stylized mark in advertisements promoting its broadcasts of Major League Baseball games.

The RED SOX marks, including the RED SOX stylized mark, are also promoted in the Club's own publications such as *Red Sox Magazine* and game programs, as well as on the Club's website (boston.redsox.mlb.com) and the website of Major League Baseball (mlb.com).

The Club, through its licensing agent MLBP, has extensively licensed the RED SOX marks, including the RED SOX stylized mark, for a wide variety of goods and services. The goods include apparel such as jerseys, shirts, t-shirts, polo shirts, pants, shorts, tops and sweatshirts; as well as toys, sporting goods, paper and printed products, furniture, home accessories, car accessories, beverage ware, sunglasses and jewelry. The licensed merchandise is sold over the Internet through opposer's website

10

and the website of Major League Baseball, among others, as well as through national retailers such as J.C. Penney's, Wal-Mart and K-Mart; and national sporting goods chains such as Champs, Foot Locker, Modell's and Dick's Sporting Goods. Opposer's retail sales of licensed "RED SOX" products in the United States have exceeded $364 million since 1995.

Applicant, Brad Francis Sherman, filed his application for the mark SEX ROD for clothing on July 19, 2005 based on an intent to use the mark in commerce. Applicant has not yet made any use of his mark.

## STANDING

Opposer, having made of record copies of its pleaded registrations showing the current status of the registrations and their ownership in opposer, has established its real interest in preventing the registration of applicant's mark for the identified goods. See Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); and Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982). Inasmuch as opposer has established its standing, opposer may raise any statutory ground for opposition, including a claim that applicant's mark is immoral or scandalous under Section 2(a) of the Trademark Act. See *Lipton Industries*, supra at 190.

## LACK OF BONA FIDE INTENT TO USE

Opposer argues that applicant's claimed bona fide intent to use his mark in commerce at the time of filing his application is

suspect "on its face" because applicant as an individual "with no relevant experience, training, or business connections of record" is claiming to have a bona fide intention to use the mark on "a substantial array" of apparel "ranging from anoraks to zori." Opposer contends that there is nothing in the record to indicate that applicant has any capacity to conduct a genuine commercial enterprise involving the manufacture and/or distribution of clothing; and that applicant produced no documents in response to opposer's discovery requests to suggest that applicant had a plan for how he might proceed with such a business.

Applicant states in his declaration that on November 23, 2007, he conducted an Internet search of websites which make it possible for an individual to design and sell custom apparel on the web with minimum investment of time and money, attaching examples of two such sites, and that he conducted the search and investigated the sites with the intention of using one such website to create and sell apparel with his "SEX ROD" mark.

In his brief, applicant argues that he is "a marketing professional with over five years' experience in online marketing, including web-based commerce"; that he is "knowledgeable of the speed and ease with which an individual can launch an online apparel business" at virtually no cost and with no forward planning; and that he could "effectively bring [the apparel] to market essentially overnight."  (Brief, pp. 1-3.) Applicant also states that he "thought it wise to register his

12

SEX ROD Mark before attempting to bring the concept to market and face the specter of having to produce volumes of records should an objection ever arise."  (Brief, p. 3.)

A determination of whether an applicant has a bona fide intention to use the mark in commerce is an objective determination based on all the circumstances.  Lane Ltd. v. Jackson International Trading Co., 33 USPQ2d 1351, 1355 (TTAB 1994).  Opposer has the initial burden of demonstrating by a preponderance of the evidence that applicant lacked a bona fide intent to use the mark on the identified goods.  The absence of any documentary evidence on the part of an applicant regarding such intent constitutes objective proof sufficient to prove that the applicant lacks a bona fide intention to use its mark in commerce.  See Commodore Electronics Ltd. v. CBM Kabushiki Kaisha Opposition, 26 USPQ2d 1503, 1507 (TTAB 1993).

In response to opposer's document production requests, applicant stated that he had no documents concerning trademark searches and investigations; no "specimens" or labels, tags or packaging; no advertising or promotional material; nor any documents concerning the advertising, marketing or promotion of the goods "with which Applicant's Mark is intended to be used." (Resp. to Req. Nos. 2, 4, 5, 9, respectively.)  The only document produced by applicant was a document showing two renderings of his mark.

Opposer having satisfied its initial burden of showing the absence of any documentary evidence regarding applicant's bona fide intention to use the mark, the burden shifts to applicant to come forward with evidence which would adequately explain or outweigh his failure to provide such documentary evidence.  See, e.g., *Commodore Electronics*, supra.

Applicant has submitted no evidence, documentary or otherwise, to support or have a bearing on his claimed bona fide intention to use the mark when the application was filed. Applicant's Internet searches and investigations were not conducted until over two years after the filing of his application and, moreover, after the notice of opposition was amended to assert a claim that applicant lacked a bona fide intent to use the mark.  Thus, they were not even remotely contemporaneous with the filing of the application. Applicant's broad and general statements in his brief regarding his asserted marketing experience are not supported by any specific facts, or by any evidence.  We can accord no evidentiary value or consideration to unsupported factual statements made by a party in its brief.  See TBMP § 704.06(b) (2d ed. rev. 2004). See also Schering-Plough HealthCare Products Inc. v. Ing-Jing Huang, 84 USPQ2d 1323, 1328 (TTAB 2007).  Furthermore, applicant's claim, in effect, that an extensive and diverse range of nearly 150 items of clothing could be marketed "essentially overnight" and "with no forward planning" is simply not credible.

Thus, this claim detracts from, rather than supports, the bona fide nature of applicant's intention.

### SECTION 2(a) - IMMORAL OR SCANDALOUS MATTER

Opposer argues that SEX ROD comprises matter that would be considered vulgar to a substantial composite of the public when used on t-shirts and other items of apparel identified in the application; and that the mark would be particularly offensive when used on goods intended for children and infants such as the "infantwear" and "baby bibs" included in the description of goods. To support its position, opposer submitted a listing from the Random House Unabridged Dictionary (2d ed. 1993) defining the word "rod" as "*Slang*... b. *Vulgar*, the penis."

Applicant admits that the term SEX ROD "is intended to possess a sexual connotation" (Int. Resp. No. 4), but maintains that the term is only "sexually suggestive." (Dec., ¶ 3.) Describing his mark "SEX ROD" as a parody of the RED SOX stylized mark, applicant argues that his mark is "an elegant and symmetrical transposition" of RED SOX; that it is a subtle play on words which "enhances the humor"; and that "the elegance of the execution mitigates any perceived vulgarity of the resulting turn of the phrase." In applicant's view, the mark "represents the at once clever yet sophomoric sense of humor that prevails in those venues in which apparel bearing the SEX ROD Stylized mark would likely be worn, e.g., ballparks, sports bars, and university campuses." (Brief, pp. 2-4; Dec., ¶ 3).

15

Registration of a mark which consists of or comprises immoral or scandalous matter is prohibited under Section 2(a) of the Trademark Act. Whether a mark is immoral or scandalous must be determined from the standpoint of, not necessarily a majority, but a substantial composite of the general public; and in the context of the goods, the relevant marketplace and contemporary attitudes. In re Boulevard Entertainment, Inc., 334 F.3d 1336, 67 USPQ2d 1475, 1477 (Fed. Cir. 2003); and In re Mavety Media Group, Ltd., 33 F.3d 1367, 31 USPQ2d 1923, 1925-26 (Fed. Cir. 1994).

"A showing that a mark is vulgar is sufficient to establish that it 'consists of or comprises immoral ... or scandalous matter' within the meaning of section 1052(a)." *Boulevard Entertainment*, supra, observing that the Court in *Mavety Media*, supra, analyzed the mark in terms of "vulgarity"; and citing In re McGinley, 660 F.2d 481, 211 USPQ 668, 673 (CCPA 1981) quoting In re Runsdorf, 171 USPQ 443, 443-44 (TTAB 1971) ("vulgar" is encompassed by the term "scandalous matter.").

Dictionary evidence alone can be sufficient to establish that a term has a vulgar meaning. *Boulevard Entertainment*, supra at 1478. In this case opposer has submitted an entry from a mainstream dictionary, the Random House Unabridged Dictionary (2d ed. 1993), demonstrating that the word "rod" has a vulgar meaning. We take judicial notice of an additional mainstream resource, The New Oxford American Dictionary (2d ed. 2005),

16

wherein the term "rod" is similarly characterized as "*vulgar slang* a penis."[5]

There are obviously other non-vulgar definitions of "rod." However, none of the other definitions is relevant here. The significance of "rod" when preceded by the word "sex" denotes only one meaning. In the context of applicant's goods, with the mark perhaps emblazoned across a t-shirt or some other item of apparel, and in the context of the marketplace, which would include all public places where the clothing would be worn or purchased, the mark would convey, not a sexually suggestive connotation as applicant contends, but rather a sexually explicit message to the viewer. We agree with opposer that the use of the term on children's and infant clothing makes the term particularly lurid and offensive.

The evidence is sufficient to show prima facie that "SEX ROD" is vulgar, and applicant has submitted no evidence of a non-vulgar meaning of the term or any other evidence to rebut opposer's showing.

Applicant's testimony as to his opinion of the perception of the mark is simply not sufficient. Whether applicant intended the mark to be humorous, or even whether some people would actually find it to be humorous, is immaterial. The fact remains

---

[5] The Board may take judicial notice of dictionary definitions. See University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

that the term would be perceived and understood as vulgar by a substantial portion of the purchasing public. Even assuming for the sake of argument that SEX ROD is a parody of opposer's "RED SOX" marks, as applicant asserts,[6] there is nothing in the parody itself which changes or detracts from the vulgar meaning inherent in the term. In other words, the parody, to the extent there is one, is itself vulgar.

## SECTION 2(a) - DISPARAGEMENT

Section 2(a) of the Trademark Act also prohibits registration of a mark that "consists of or comprises...matter which may disparage...persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." As noted in University of Notre Dame du Lac v. J.C. Food Imports, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), Section 2(a) embodies concepts of the right to privacy and publicity, that is, the right to protect and to control the use of one's identity. In effect, this provision of Section 2(a) protects against appropriation of one's identity by another and subjecting it to contempt or ridicule. See Greyhound Corp. v. Both Worlds Inc., 6 USPQ2d 1635, 1639 (TTAB 1988) ("Disparagement is essentially a violation of one's right of privacy -- the right to be 'let alone' from contempt or ridicule.").

---

[6] Applicant states that he did not deliberately set out to parody opposer's mark, but that the resulting mark is, in effect, a parody. (Brief, p. 4.)

18

The Board in *Greyhound* set forth the two elements of a claim of disparagement: 1) that the communication reasonably would be understood as referring to the plaintiff; and 2) that the communication is disparaging, that is, would be considered offensive or objectionable by a reasonable person of ordinary sensibilities.[7]

Thus, as an initial matter, we must determine whether the designation RED SOX which opposer claims applicant is attempting to appropriate would be understood as opposer's identity.

As previously noted, opposer, Boston Red Sox Baseball Club Limited Partnership, is the owner of the "Boston Red Sox Major League Baseball" club. The club has operated under the nickname "Red Sox" for 100 years. Since 1908 the name "Red Sox" has been used by the media, press, fans and the public to refer to both the club itself and to the source of its baseball game services. There is no question that the name "Red Sox" is the identity of the baseball club, apart from being a trademark for the entertainment services the club provides.

---

[7] As the Board noted in Harjo v. Pro-Football, Inc., 50 USPQ2d 1705, 1740 (TTAB 1999), there are different tests for disparagement depending upon whether the party alleging disparagement is an individual or commercial corporate entity, as in *Greyhound*, or a non-commercial group, such as a religious or racial group, as in *Harjo*. Id., *rev'd on other grounds*, 284 F.Supp.2d 96, 68 USPQ2d 1225 (D.D.C. 2003), *remanded,* 415 F.3d 44, 75 USPQ2d 1525 (D.C. Cir. 2005), *dismissed on remand,* (D.D.C. June 25, 2008). Because opposer is a commercial corporate entity, the test enunciated in *Greyhound* is applicable here.

The stylized version of the "Red Sox" name 𝕽𝕰𝕯 𝕾𝕺𝕏 has been used by the organization for more than 70 years to identify the team. The name appears in large letters across the front of the players' uniforms; it has been heavily promoted to the public through use on a wide range of merchandise and materials; and it has received extensive public exposure over the years in all forms of visual media. As such, opposer's name in this format has come to be recognized by the public not only as a mark identifying the source of opposer's baseball games, but as an alternative form of its "Red Sox" nickname and another symbol of the Red Sox organization. Indeed, applicant admits that the designation 𝕽𝕰𝕯 𝕾𝕺𝕏 "is identified and associated with opposer" (Adm. No. 5).

Applicant has copied the form, style and structure of the Club's corporate symbol, and because his mark is so visually similar to the original, many consumers, and in particular Red Sox fans, upon seeing the mark displayed on a t-shirt or a jersey, will recognize it as referring to the Red Sox symbol.

Furthermore, applicant admits that the design of his mark is intended to refer to opposer (Ans., ¶ 8), and to evoke the Club (Dec., ¶ 2). Applicant's intent is strong evidence that he will accomplish his purpose, and that the mark will be perceived by the public as referring to opposer. See Dunkin' Donuts of America, Inc. v. Metallurgical Exoproducts Corp., 840 F.2d 917, 6 USPQ2d 1026 (Fed. Cir. 1988) (evidence of intent is pertinent to

Section 2(a) claim of disparagement).  See also *Notre Dame*, supra at 509, regarding intent in the context of a Section 2(a) claim of false connection ("Evidence of such intent would be highly persuasive that the public will make the intended false association.  The defense that the result intended was not achieved would be hollow indeed.").

We turn then to the question of whether applicant's mark disparages opposer's identity.  As the Board stated in *Greyhound*, disparagement is "the publication of a statement which the publisher intends to be understood, or which the recipient reasonably should understand, as tending 'to cast doubt upon the quality of another's land, chattles, or intangible things.'" *Greyhound* citing Restatement (Second) of Torts §629 (1977).  In the context of Section 2(a), a disparaging mark will cast doubt upon the quality of a plaintiff's corporate goodwill.  See *Harjo*, supra at 1740.

We have already determined that SEX ROD would be perceived as a vulgar term by a substantial number of consumers.  Inasmuch as applicant's mark in the identical style and format would be understood as a reference to opposer, the mark would be viewed as a sexually vulgar version of the club's symbol and as making an offensive comment on or about the club.[8]

---

[8] We take judicial notice of the definition of "vulgar" as "5 a: offensive in language : EARTHY b: lewdly or profanely indecent." *Merriam-Webster Online Dictionary* (2008) (at www.merriam-webster.com). The Board may take judicial notice of online reference works which

Applicant argues that although the mark "is indeed intended to evoke the Club" (Brief, p. 3), the mark "neither contains any profanity nor tarnishes the reputation of the Club." Applicant points to the fact that the team's "members were popularly know[n] as the 'Idiots' just three years ago due to the edgy image that they portrayed both on and off the field, often with the tacit consent of the Club." (Orlinsky Dec., ¶ 3.) Opposer acknowledges that the Red Sox players and fans referred to the team "affectionately" as the "idiots," (Brief, p. 36), and further notes that the Club, itself, has used suggestive phrases such as "You Have RED SOX Envy" on its t-shirts. (Orlinsky Reply Dec., ¶ 2.)

While the line between what is or is not offensive may not always be clear, in this case it is. The difference between opposer's expressions of subtle or good-natured ribbing and applicant's crude, overtly sexual mark SEX ROD is obvious. Because applicant's mark is offensive, and because the public will associate the offensive message with opposer, the mark, in the language of the Statute, "may disparage" opposer.

**LIKELIHOOD OF CONFUSION**

In view of opposer's valid and subsisting registrations, opposer's priority with respect to the registered marks for the goods and/or services identified therein is not in issue.

---

exist in printed format or have regular fixed editions. See In re Red Bull GmbH, 78 USPQ2d 1375, 1378 (TTAB 2006).

King Candy Co., Inc. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

In addition, the record shows that opposer has used the stylized mark RED SOX in connection with apparel such as t-shirts, sweatshirts and jerseys since long prior to the filing date of the application, which, since applicant claims only an intention to use the mark, is the earliest date on which applicant is entitled to rely. (Ans., ¶¶ 2, 4, 7; Adm. Nos. 3-5; Orlinsky Dec., ¶¶ 25, 27; Exhs. T, V, W.)

We turn then to the issue of likelihood of confusion. Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. In re E.I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). In appropriate cases, a single *du Pont* factor may be dispositive of the likelihood of confusion analysis. See Champagne Louis Roederer S.A. v. Delicato Vineyards, 148 F.3d 1373, 47 USPQ2d 1459 (Fed. Cir. 1998); and Kellogg Co. v. Pack 'Em Enterprises Inc., 14 USPQ2d 1545 (TTAB 1990), aff'd, 951 F.2d 330, 21 USPQ2d 1142 (Fed. Cir. 1991). In this case, despite the *du Pont* factors of fame, similarity of the goods, channels of trade and conditions of purchase which, as discussed below, favor a finding of likelihood of confusion, the factor of the dissimilarity of the marks is dispositive.

23

**Fame of opposer's "RED SOX" marks**

We turn first to the factor of fame, because the fame of the prior mark, if it exists, plays a "dominant role in the process of balancing the *DuPont* factors."  Recot, Inc. v. M.C. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000).  Applicant acknowledges that "RED SOX" is a famous mark and a famous Major League Baseball club.  (Adm. Nos. 6, 7.)  Furthermore, opposer's evidence of long use, substantial sales, extensive media recognition and coverage, and significant exposure of the RED SOX marks to the public, demonstrates that opposer's RED SOX marks are famous for opposer's entertainment services and, thus, entitled to a broad scope of protection.  That protection extends to cover opposer's licensed merchandise, including clothing.  The fame factor weighs heavily in favor of finding likelihood of confusion.  See Recot Inc. v. M.C. Becton, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000); and Kenner Parker Toys, Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).

As we noted, opposer has established prior common law rights in the mark RED SOX for clothing, including t-shirts, sweatshirts and jerseys.  For purposes of discussing the remaining factors, we will focus on this mark and goods as they are the closest to the mark and goods in the involved application.

24

**Goods/Channels of trade/Conditions of purchase**

The goods identified in the application, which include t-shirts, jerseys and sweatshirts, are identical to the items of clothing on which opposer uses its stylized RED SOX mark. Furthermore, because there are no restrictions in the application, we must presume that applicant's clothing will be sold, not just over the Internet as applicant seems to argue, but in all the normal channels of trade for such goods, including the department stores and sporting goods stores where opposer's clothing bearing the RED SOX stylized mark is sold; and that applicant's clothing will reach all the usual purchasers, including ordinary consumers who are also among the purchasers for opposer's clothing. See Octocom Systems Inc. v. Houston Computers Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990);

It is also important to consider that t-shirts and many of the other casual, everyday items of wearing apparel identified in applicant's application are relatively inexpensive and are therefore likely to be purchased by consumers on impulse, and without a great deal of care. This is a factor that increases the likelihood of confusion. See *Recot*, supra at 1899 ("When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care.").

**The marks**

We turn next to a comparison of applicant's mark SEX ROD with opposer's mark RED SOX and a determination of the similarity or dissimilarity of the marks in their entireties in terms of sound, appearance, meaning and commercial impression. See *du Pont*, supra. See also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005).

Both marks contain two, three-letter words using the same six letters. However, by rearranging four of the six letters in RED SOX (leaving the middle letter of each word in place) applicant has created two distinctly different words that are completely dissimilar to RED SOX in sound, and radically different in meaning.

The marks are visually similar. Indeed, when displayed side-by-side, as these marks may be encountered in the marketplace, the two marks are remarkably similar in appearance. However, the marks must be considered as a whole, and the words in these marks, RED SOX and SEX ROD, play a significant role in creating the overall commercial impact of the marks. In fact, the words are the most significant part of these marks. It has frequently been stated that it is the word portion of marks, rather than the particular display of the words, that is likely to have a greater impact on purchasers and be remembered by them. See In re Appetito Provisions Co. Inc., 3 USPQ2d 1553, 1554 (TTAB

1987) (the word portion of a composite word and design mark is generally accorded greater weight because it would be used to request the goods). That principle is particularly applicable here. We find that the differences in the two marks, caused by the attention-grabbing words in applicant's mark, result in differences in sound and meaning that far outweigh any visual similarity due to the display of the words.

This case is distinguishable from cases such as Nailtiques Cosmetic Corp. v. Salon Sciences Corp., 41 USPQ2d 1995, 1998 (S.D. Fla. 1997) and Hard Rock Cafe Licensing v. Pacific Graphics. 776 F.Supp. 1454, 21 USPQ2d 1368 (W.D. Wash. 1991) on which opposer relies. The finding of similarity in those cases was not based on the display of the marks alone, but on additional factors, including shared word elements. For example, in *Nailtiques*, the Court found that defendant's mark PRO-TECHNIQUES was similar in sound to plaintiff's mark NAILTIQUES (and found "perhaps most importantly" that plaintiff presented evidence of actual confusion). In *Hard Rock Cafe*, the Court found not only that the "the graphics are virtually identical" in the HARD RAIN CAFE logo and HARD ROCK CAFE logo, and that the stylized lettering in the words was the same, but also that there were "only three letters that are different in the marks," in effect finding that the wording was otherwise the same. The present case is also distinguishable from Coca-Cola Co. v. Gemini Rising, Inc., 346 F.Supp. 1183, 175 USPQ 56, 59 (E.D.N.Y. 1972),

where the Court granted a preliminary injunction finding, inter alia, that ENJOY COCAINE for posters is likely to cause confusion with COCA-COLA. In that case the defendant's mark not only contained the same script and color as the famous COCA-COLA mark, but also some of the same wording. The Court specifically noted that the term "COCA" remained a "recognizably visible" portion of the mark and that the mark was frequently displayed with the word ENJOY. Moreover, the record in that case included evidence of actual confusion as to sponsorship.

Because the words RED SOX and SEX ROD convey the strongest impression in the marks, and the words are so dissimilar in all significant respects, we find that the marks as a whole create different overall commercial impressions. The fact that, as we noted earlier, applicant's mark may evoke or bring to mind opposer's mark does not in itself necessarily compel a finding of likelihood of confusion as to source. See In re Ferrero, 479 F.2d 1395, 178 USPQ 167, 168 (CCPA 1973).

Indeed, the vulgar and disparaging nature of applicant's mark adds further support to our finding that, in this case, although consumers may be reminded of opposer's mark, they are not likely to believe that opposer is sponsoring or endorsing applicant's goods. Compare, e.g., Coca-Cola Co., supra, discussed above.

In finding that the marks are not similar, we have given no weight to applicant's argument that his mark is a parody. Parody

28

is not a defense if the marks would otherwise be considered confusingly similar. See, e.g., Columbia Pictures Industries, Inc. v. Miller, 211 USPQ 816, 820 (TTAB 1981) ("The right of the public to use words in the English language in a humorous and parodic manner does not extend to use of such words as trademarks if such use conflicts with the prior use and/or registration of the substantially same mark by another.").

### Opposer's claim of bad faith

As we noted earlier, applicant has admitted that opposer's "RED SOX" mark is famous, that his design "is intended to refer" to the Club, and that the mark "is indeed intended to evoke the Club." Opposer maintains that by these admissions, and in view of the timing of his filing of the application in July 2005, shortly after the 2004 World Series, applicant has shown that his true purpose in selecting the mark was to cash in on opposer's goodwill.

Applicant, for his part, argues that in "brainstorming clever tee-shirt and/or clothing concepts to sell and market online," applicant

> intended neither to "cash in" on the Club's recent success, nor parody the Club in this endeavor. It is coincidental that the concept he found to be most humorous also parodies the Club; it is not coincidental that applicant viewed it as his most marketable. (Brief, p. 4.)

Applicant further argues that:

> ...the intention is not to imply endorsement by the Club or promote confusion with the Club's marks, but rather lay the foundation the humor intended, which

29

> is to hold the revered status [of] the Club in glaring contrast with the sexually suggestive term "SEX ROD." ...it is this very contrast, considering the revered place that the Club holds in the eyes of the general public, that renders confusion impossible and make it clear that the mark is the work of an independent humorist.  (Dec., ¶ 2.)

The Board in Roger & Gallet S.A. v. Venice Trading Co. Inc., 1 USPQ2d 1829 (TTAB 1987), stated that intent may, and ought to, be taken into account when resolving the issue of likelihood of confusion when that issue is not free from doubt.  However, if confusion is not likely to result from the use of the marks, the motive of an applicant cannot affect its right to the registration sought.  See Shoe Corporation of America v. The Juvenile Shoe Corporation of America, 266 F.2d 793, 121 USPQ 510, 512 (CCPA 1959) ("evidence of intent may influence the ultimate question of likelihood of confusion, but is not necessarily controlling"); and Electronic Water Conditioners, Inc. v. Turbomag Corporation, 221 USPQ 162 (TTAB 1984).  In this case, we have no doubt concerning the likelihood of confusion.  Furthermore, applicant's intent, while clearly not altogether innocent, was not to come so close to opposer's mark so as to deceive the public.

### Finding on likelihood of confusion

We find, having given due consideration to the fame of opposer's mark, and notwithstanding all the other factors in opposer's favor including the identity of the goods and the impulse nature of their purchase, that the marks in this case are

30

simply too dissimilar to support a finding of likelihood of confusion. See, e.g., Kellogg Co., supra at 1144 (dissimilarity of the marks outweighed all other du Pont factors, "even if opposer offered evidence [that its mark has become famous]"). While the fame of opposer's RED SOX mark extends to the form of RED SOX in the particular stylized display, we cannot say, based on this record, that the fame of the mark extends to the stylization alone, apart from the words in the mark. The dissimilarity of the marks is dispositive in this case.

## 2(a) - FALSE SUGGESTION OF A CONNECTION

This provision of Section 2(a) prohibits registration of "matter which may...falsely suggest a connection with persons, living or dead, institutions, beliefs or national symbols." To establish this claim, opposer must prove (1) that applicant's mark is the same or a close approximation of opposer's previously used name or identity; (2) that applicant's mark would be recognized as such by purchasers, in that the mark points uniquely and unmistakably to opposer; (3) that opposer is not connected with the goods that are sold or will be sold by applicant under his mark; and (4) that opposer's name or identity is of sufficient fame or reputation that when applicant's mark is used on his goods, a connection with opposer would be presumed. See L. & J.G. Stickley Inc. v. Cosser, 81 USPQ2d 1956 (TTAB 2007); and Buffett v. Chi-Chi's, Inc., 226 USPQ 428, 429 (TTAB 1985).

We turn to the first element.  As distinguished from the test for disparagement, which requires that applicant's mark be "reasonably understood as referring to" opposer's identity RED SOX , the determination of whether the mark is a "close approximation" of opposer's identity is a more stringent one, requiring a greater degree of similarity between the two designations.  For the same reasons we found that the two marks are not similar for purposes of the likelihood of confusion analysis, we find here that applicant's mark is not a close approximation of opposer's identity.

In any event, considering the inherent nature of applicant's mark, and the fact that the mark is disparaging to opposer as discussed above, the public would not reasonably believe that opposer, a famous and reputable organization, would be associated with a mark that disparages itself.

Because the first element of the test has not been met, opposer has failed to prove that applicant's mark falsely suggests a connection with opposer, and therefore we need not address the remaining elements of this Section 2(a) claim.

**Decision:**  The opposition is sustained on the grounds that the mark is scandalous and disparaging under Section 2(a) of the Trademark Act.  The opposition is also sustained based on applicant's lack of bona fide intent to use the mark in commerce. The opposition is dismissed on the ground of likelihood of

32

confusion under Section 2(d) of the Act and on the ground that the mark falsely suggests a connection with opposer under Section 2(a) of the Act.